JEFFREY I. WEINBERGER (SBN 056214)
*jeffrey.weinberger@mto.com*
TED G. DANE (SBN 143195)
*ted.dane@mto.com*
HEATHER E. TAKAHASHI (SBN 245845)
*heather.takahashi@mto.com*
ELIZABETH E. LAUGHTON (*pro hac vice*)
*elizabeth.laughton@mto.com*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Ángeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

ERIC K. CHIU (State Bar No. 244144)
*eric.chiu@mto.com*
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

Attorneys for Plaintiffs
TAKEDA PHARMACEUTICAL CO., LTD.,
TAKEDA PHARMACEUTICALS U.S.A,
INC., AND TAKEDA PHARMACEUTICALS
AMERICA, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAKEDA PHARMACEUTICAL CO., LTD., TAKEDA PHARMACEUTICALS U.S.A., INC., AND TAKEDA PHARMACEUTICALS AMERICA, INC.,<br><br>                Plaintiffs,<br><br>      vs.<br><br>TWI PHARMACEUTICALS, INC.,<br><br>                Defendant. | Case No. 5:13-cv-02420 LHK (PSG)<br><br>**TAKEDA'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT**<br><br>**Declaration of Heather E. Takahashi, and [Proposed] Order Filed Concurrently Herewith**<br><br>Date:        April 9, 2015<br>Time:        1:30 p.m.<br>Judge:       Hon. Lucy H. Koh<br>             San Jose Courthouse<br>             Courtroom 8 - 4th Floor |

1

## NOTICE OF MOTION AND MOTION

2 TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3      PLEASE TAKE NOTICE that on Thursday, April 9, 2015, at 1:30 PM, or as soon

4 thereafter as counsel may be heard, in Courtroom 8, 4th Floor, of this Court, before the Honorable

5 Lucy H. Koh, Plaintiffs Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals

6 U.S.A., Inc., and Takeda Pharmaceuticals America, Inc. (collectively, "Takeda") shall and hereby

7 do move for summary judgment in Takeda's favor on TWi's Ninth and Tenth Affirmative

8 Defenses of Defendant TWi Pharmaceuticals, Inc. ("TWi") in its Answer to the Second Amended

9 Complaint for Patent Infringement.

10      This motion is based on: (i) the accompanying memorandum of points and authorities; (ii)

11 the Declaration of Heather E. Takahashi submitted herewith; (iii) all pleadings and papers of

12 record and on file in this case; and (iv) such other evidence and argument as may be presented to

13 the Court before or at the time of the hearing.

14

## RELIEF REQUESTED

15      Takeda respectfully requests that the Court find that there is no material issue of fact to

16 support TWi's allegations of inequitable conduct and grant summary judgment in Takeda's favor

17 on TWi's Ninth and Tenth Affirmative Defenses in its Answer to the Second Amended Complaint

18 for Patent Infringement.

19                                        Respectfully submitted,

20 DATED: February 19, 2015               MUNGER, TOLLES & OLSON LLP
                                          HEATHER E. TAKAHASHI
21

22

23                                        By:        _/s/ Heather E. Takahashi_
                                                 HEATHER E. TAKAHASHI
24
                                          Attorneys for Plaintiffs
25                                        TAKEDA PHARMACEUTICAL CO., LTD.,
                                          TAKEDA PHARMACEUTICALS U.S.A., INC., AND
26                                        TAKEDA PHARMACEUTICALS AMERICA, INC.

27

28

TAKEDA'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**                                          **Page**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND .................................................................................................. 2

        A.      The '187 Patent ....................................................................................... 2

                1.      TAP's Discovery Of The Optimal PPI Dosage Form ................. 2

                2.      Takeda's Development Of TAK-390MR ..................................... 5

                3.      The Prosecution Of The '187 Patent .......................................... 7

        B.      The '158 Patent ....................................................................................... 8

                1.      The Invention Of The '158 Patent .............................................. 8

                2.      The Prosecution Of The '158 Patent .......................................... 9

III.    ARGUMENT ..................................................................................................... 10

        A.      The Summary Judgment Standard ....................................................... 10

        B.      No Reasonable Factfinder Could Find Inequitable Conduct On This Record. ...... 11

                1.      No Reasonable Factfinder Could Find That The Inventors Of The
                        '187 Patent Engaged In Inequitable Conduct .......................... 12

                        (a)     No Reasonable Factfinder Could Find That The Inventors Of
                                The '187 Patent Specifically Intended To Deceive The PTO. ...... 12

                        (b)     No Reasonable Factfinder Could Find That The Alleged
                                Misrepresentations or Omissions Made to the PTO Were
                                Material. ....................................................................... 15

                2.      No Reasonable Factfinder Could Find That the Inventors Of The
                        '158 Patent Engaged In Inequitable Conduct .......................... 16

                        (a)     No Reasonable Factfinder Could Find That The Inventors Of
                                The '158 Patent Specifically Intended To Deceive The PTO. ...... 17

                        (b)     No Reasonable Factfinder Could Find That The Alleged
                                Misrepresentations or Omissions Made to the PTO Were
                                Material. ....................................................................... 18

IV.     CONCLUSION .................................................................................................. 19

**TABLE OF AUTHORITIES** Page

FEDERAL CASES

*1st Media, LLC v. Electronic Arts, Inc.*,
694 F.3d 1367 (Fed. Cir. 2012) ....................................................................... 14, 15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................................... 10, 11

*Apotex Inc. v. UCB, Inc.*,
763 F.3d 1354 (Fed. Cir. 2014) ....................................................................... 14, 18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................. 1

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
391 U.S. 253 (1968) ............................................................................................ 11

*Fiskars, Inc. v. Hunt Mfg. Co.*,
221 F.3d 1318 (Fed. Cir. 2000) ................................................................. 14, 15, 17

*Hazel-Atlas Glass v. Hartford-Empire Co.*,
322 U.S. 238 (1944) ..................................................................................... 15, 19

*Hess v. Advanced Cardiovascular Sys., Inc.*,
106 F.3d 976 (Fed. Cir. 1997) ......................................................................... 13, 16

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999) ............................................................................. 10

*Keystone Driller Co. v. Gen. Excavator Co.*,
290 U.S. 240 (1933) ........................................................................................... 15

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*,
863 F.2d 867 (Fed. Cir. 1988) ............................................................................. 11

*Mahurkar v. C.R. Bard, Inc.*,
79 F.3d 1572 (Fed. Cir. 1996) ............................................................................... 7

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
244 F.3d 1365, 1378 (Fed. Cir. 2001) .......................................................... 14, 15, 18

*Molins PLC v. Textron, Inc.*,
48 F.3d 1172 (Fed. Cir. 1995) ............................................................................. 15

*Precision Instruments Mfg. Co. v. Auto. Maint. Mach. Co.*,
324 U.S. 806 (1945) ........................................................................................... 15

TAKEDA'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF AUTHORITIES**                                       Page

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
     537 F.3d 1357 (Fed. Cir. 2008) ............................................................... 11

*Therasense, Inc. v. Becton, Dickinson and Co.*,
     649 F.3d 1276 (Fed. Cir. 2011) ........................................................... passim

**STATUTES AND RULES**

35 U.S.C. § 102 ........................................................................................... 6, 7

Fed. R. Civ. P. 56(a) ...................................................................................... 10

Pub. L. No. 112-29 .......................................................................................... 6

**OTHER AUTHORITIES**

Manual of Patent Examining Procedure § 609.06 ................................... 14, 15

## MEMORANDUM OF POINT AND AUTHORITIES

## I.    INTRODUCTION

For decades inequitable conduct claims were an "absolute plague" in patent litigation, alleged in seemingly every case, often with little to no factual basis. *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1289 (Fed. Cir. 2011).[1] In 2011, the Federal Circuit "tighten[ed] the standards for finding both intent and materiality in order to redirect [the inequitable conduct] doctrine that ha[d] been overused to the detriment of the public." *Id.* at 1289.

TWi, however, now visits that plague on this litigation, pressing exactly the type of allegations, "brought on the slenderest grounds," that *Therasense* was intended to prevent. *Id.* TWi has articulated two supposed grounds for its inequitable conduct defense: first, that the named inventors of the patents-in-suit, U.S. Patent Nos. 8,461,187 (the "'187 patent") and 8,173,158 (the "'158 patent"), are not the true inventors of the claimed subject matter of those patents; and second, that the named inventors deceived the United States Patent and Trademark Office ("PTO") by failing to disclose Takeda's invention of its formulation for Dexilant®. Neither ground finds support in the evidence. With regard to inventorship, the uncontroverted record demonstrates that the named inventors were in fact the individuals who conceived of the subject matter of the '187 and '158 patents. With regard to disclosure of the Dexilant formulation, the inventors of both patents, during prosecution, submitted to the PTO the Akiyama references that disclose that formulation.

Accordingly, there simply is no evidence to support TWi's allegations. Because TWi bears the burden of establishing its inequitable conduct defense by clear and convincing evidence, Takeda can prevail by pointing to the lack of evidence supporting TWi's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). Here, there is no evidence — and certainly not "clear and convincing" evidence — of inequitable conduct by the inventors or patent prosecutors of the patents-in-suit.

---

[1] Internal quotation marks and citations omitted unless otherwise noted.

## II.     BACKGROUND

The '187 and '158 patents relate to a class of drugs known as proton pump inhibitors ("PPIs"). PPIs are used to treat gastroesophageal reflux disease ("GERD"). *See* Ex. 1 ('187 patent) at col.1 ll.15-62; Ex. 2 ('158 patent) at col.1 l.24 to col.2 l.19.[2]

### A.     The '187 Patent

#### 1.     TAP's Discovery Of The Optimal PPI Dosage Form

The '187 Patent is entitled "Multiple PPI Dosage Form" and is directed to pharmaceutical dosage forms containing two separate doses of a PPI, as well as methods of administering those dosage forms. *See* Claim Construction Order [D.N. 95] at 2. The invention of the '187 patent grew out of the efforts of TAP Pharmaceuticals, Inc., to find a more powerful acid reflux medication.

In the 1980s, Takeda Chemical Industries, Ltd. (the former name for Plaintiff Takeda Pharmaceutical Co. Ltd., hereinafter "Takeda"), and Abbott Laboratories, Inc. ("Abbott"), formed a joint venture called TAP Pharmaceuticals, Inc. ("TAP"). *See* Ex. 14 (Watkins Dep. Tr.) at 16:23-18:21. In 1995 TAP received FDA approval for a PPI formulation called Prevacid®. Ex. 4 (Peura Report) at ¶ 37; Ex. 21 (2000 PDR) at TAKEDA0508114 (showing that TAP manufactured Prevacid). Prevacid delivers a single dose of lansoprazole, a PPI that shuts down proton pumps that make stomach acid. Ex. 3 (Fennerty Report) at ¶¶ 26-27; Ex. 21 (2000 PDR) at TAKEDA0508109. Like other conventional PPI formulations, Prevacid is generally administered once a day before breakfast. Ex. 4 (Peura Report) at ¶ 42. However, as the day goes on, new proton pumps are generated, and the acidity of the stomach increases. As a result, some patients who take conventional PPIs experience nighttime heartburn symptoms that interfere with sleep. *Id.* at ¶¶ 42-46; *see generally* Ex. 1 ('187 patent) at col.1 ll.28-48. Frequent nocturnal heartburn may impair quality of life, sleep, and productivity. Ex. 4 (Peura Report) at ¶ 62.

In early 2003, TAP scientists Dr. Majid Vakily,[3] a clinical pharmacologist, and Dr. Rajneesh Taneja, a formulation scientist, began working together to identify a new PPI dosage

---

[2] All exhibits are attached to the Declaration of Heather Takahashi filed concurrently herewith.

form that could "provide a full day of therapeutic effect while being administered on a once a day basis." Ex. 1 ('187 patent) at col.1 ll.46-48. At the time, the amount of PPI in the blood necessary to maintain a sustained therapeutic effect was not known. Dr. Vakily conducted sophisticated pharmacokinetic/pharmacodynamic modeling to determine the relationship between the PPI plasma concentration and intragastric pH, a measure of stomach acidity, using a model that accounted for circadian rhythms and the effect of food on intragastric pH. Ex. 22 (5/6/2003 Minutes) at DEX0540841; Ex. 24 (PK-PD Modeling) at TAKEDA012828.

Using this model, Dr. Vakily was able to establish the threshold concentrations above which a PPI would be effective, based on the ability of the PPI to raise intragastric pH levels by reducing the amount of acid in the stomach.[4] As set forth in Example 1 of the '187 patent, Dr. Vakily discovered that a steady-state concentration of at least 100 ng/ml was necessary to achieve a therapeutic effect, and that maximum therapeutic effect was attained at steady-state concentrations of 450 ng/ml or more, as shown here:



Ex. 1 ('187 patent) at Fig. 1 & col.10 ll.38-49. Dr. Vakily also used this model to predict changes in intragastric pH over time following the administration of a PPI in various formulations. He concluded that the pulsatile release of two doses of PPI would improve control of intragastric pH, particularly at nighttime. *See* Ex. 1 ('187 patent) at col.2 ll.37-47; Ex. 22 (5/6/2003 Minutes) at

---

[3] Dr. Vakily's full last name is "Vakilynejad," although he usually uses the last name "Vakily." *See* Ex. 12 (10/10/2014 Vakily Dep. Tr.) at 7:13-21.

[4] The pH scale ranges from 1-14. A pH level of 1 is strongly acidic, a pH level of 14 is strongly basic, and a pH of 7 is neutral.

DEX0540841. Dr. Vakily shared the results of this modeling with Dr. Taneja in March 2003. *See* Ex. 23 at TAKEDA0800423-40 (email with draft modeling paper dated March 19, 2003); Ex. 24 (PK-PD Modeling) at TAKEDA012817-33; Ex. 25 (metadata showing that Ex. 24 was last saved on March 19, 2003).

Dr. Vakily and Dr. Taneja also performed a Phase I clinical study to determine the rate and extent of absorption of lansoprazole from different parts of the intestine. Ex. 1 ('187 patent) at col.10 l.55 to col.11. l.64 (Example 2); Ex. 26 (email dated May 23, 2003, describing planned study). They discovered that lansoprazole absorption is similar across the length of the small intestine but decreases significantly in the colon. Ex. 1 ('187 patent) at col.9 ll.10-22 and col.11 ll.57-64; *see also* Ex. 27 (Final Scintipharma Report dated May 18, 2004). To account for this "decreasing absorption in the downstream portions of the gastrointestinal tract," they concluded that it was preferable "to load the dosage forms with the PPI such that the second dose is higher than the first dose of the PPI." Ex. 1 ('187 patent) at col.9 ll.10-22. Their work thus indicated various attributes of an optimal PPI dosage form:

- It would deliver two pulses of drug;
- Those pulses would be separated by a period of time, each pulse sufficient to raise plasma levels above 100 ng/ml; and
- The second dose would contain 10% more drug than the first pulse. *Id.* at col.10 ll.41-49 and col.9 ll.10-22.
- Most preferably, the first and second dose would be separated by more than 2 hours and each dose would be sufficient to raise plasma levels above 450 ng/ml. *Id.* at col.9 ll.23-43; *see also* Ex. 24 (PK-PD Modeling) at TAKEDA012828, -32; Ex. 28 (Clinical Study Report for Site-Absorption Study) at TAKEDA0015245; *see* Ex. 13 (1/28/2015 Vakily Dep. Tr.) at 225:14-231:6.

These attributes are embodied in the claims of the '187 patent. Claim 1 discloses a pulsed release system, as follows:

1

> 1. A dosage form comprising a PPI wherein the PPI is released from the dosage form as a first and second dose, wherein the first and second doses are released from the dosage form as discre[te][5] pulses of the PPI separated by a period of time, wherein the second dose contains at least 10% more of the PPI than the first dose, and wherein each of the first and second doses comprise a sufficient amount of the PPI to raise plasma levels of the PPI to a threshold concentration of at least 100 ng/ml.

Ex. 1 ('187 patent) col.12. Dependent claims 2 and 7 recite a dosage form and a method of treatment with a dosage form, respectively, in which "the second dose begins to be released between 2 and 20 hours after the first dose begins to be released." *Id.* Claim 5 requires that "each pulse of the PPI is sufficient to maintain plasma concentrations above the threshold concentrations for at least 30 minutes," and claim 16 requires that each pulse "raise plasma levels of the PPI to a threshold concentration of at least 450 ng/ml." *Id.*

## 2.    Takeda's Development Of TAK-390MR

At the same time that TAP was developing an optimal PPI dosage form, Takeda was separately, and without the knowledge of the TAP joint venture, developing a new dosage form containing dexlansoprazole called TAK-390MR (the development code name for Dexilant).[6] *See* Ex. 7 (10/1/2014 Kurasawa Dep. Tr.) at 9:21-11:3; Ex. 5 (Charman Report) at ¶ 53; Ex. 12 (10/10/2014 Vakily Dep. Tr.) at 105:7-11. TAK-390MR contains two types of granules with enteric coats designed to release dexlansoprazole at different points in the intestines. *See* Ex. 2 ('158 patent) at col.20 ll.46-56. Takeda's international PCT patent application disclosing TAK-390MR was published as PCT Publication No. WO 2004/035020 ("Akiyama I"). *See* Ex. 18 (Akiyama I); *see also* Ex. 19 (Akiyama II) at p. 1 (listing WO 2004/035020). The international application entered the national phase and in 2010 was issued as U.S. Patent No. 7,790,755 ("Akiyama II"). *See* Ex. 19 (Akiyama II). The earliest U.S. filing date (that is, the priority date) for

---

[5] The parties agree that the term "discreet" is a typographical error and should be "discrete."

[6] Dexlansoprazole is an enantiomer of lansoprazole, the active ingredient in Prevacid. Ex. 4 (Peura Report) at ¶ 69.

1    the issued patent is October 15, 2003, which is the filing date of the international application. *See*

2    35 U.S.C. § 102(e) (2015);[7] Ex. 29 (102(e) Flowcharts).

3          In 2003, after Dr. Vakily's modeling and while Dr. Vakily and Dr. Taneja were planning

4    the site-absorption study, Takeda began sharing pharmacokinetic data from clinical studies of

5    TAK-390MR (but not the formulation itself) with TAP. Ex. 22 (5/6/2003 Minutes) at

6    DEX0540836-39; Ex. 30 (presentation); Ex. 11 (Taneja Dep. Tr.) at 42:4-44:20. Dr. Vakily used

7    this data to evaluate TAK-390MR's suitability as TAP's next-generation acid reflux medication.

8    *See* Ex. 31 (Review of TAK-390 Plasma Pharmacokinetics) at TAKEDA0942015-16; Ex. 32

9    (Pharmacokinetic Results for TAK-390MR) at TAKEDA00945202-04.

10         TAK-390MR satisfied several of the criteria that TAP had identified as important in its

11   next PPI product, including the criteria, embodied in the claims of the '187 patent, that the dosage

12   form deliver two pulses of drug separated by a period of time, with each dose capable of raising

13   plasma levels to at least 100 ng/ml. *See* Ex. 31 at TAKEDA0942015-16 ("Important predefined

14   pharmacokinetic criteria were satisfied or nearly satisfied by TAK-390 modified release

15   formulation."); Ex. 32 at TAKEDA00945202-04 ("All pre-defined PK criteria (1-6) met or nearly

16   met."); Ex. 13 (1/28/2015 Vakily Dep. Tr.) at 182:1-185:6 (testimony regarding same).

17         Accordingly, TAP accepted TAK-390MR as one of the dosage forms that it would

18   continue to develop. *See* Ex. 33 (9/17/2003 Minutes) at DEX1169503-04. In February 2004, TAP

19   and Takeda signed an agreement whereby Takeda licensed TAP, *inter alia*, to develop, use, and

20   sell TAK-390MR. *See* Ex. 34 (License Agreement). From that point on, TAP led the clinical

21   development of TAK-390MR in the United States. In 2007, TAP filed the New Drug Application

22   for Dexilant. Ex. 16 (Dexilant NDA, Section 2.7.1) at DEX0010627, -52. In 2008, Takeda

23   acquired Abbott's share in TAP, which was renamed Takeda Pharmaceuticals U.S.A., Inc. *See* Ex.

24   35 (Stipulation Regarding Interests Held by Plaintiffs). Takeda obtained FDA approval to sell

25   Dexilant in the United States on January 30, 2009. Ex. 36 (NDA Approval) at DEX0091470.

26   _____

27   [7] The America Invents Act ("AIA"), Pub. L. No. 112-29, took effect on March 18, 2013. Because
     the applications for the patents at issue in this case were filed before that date, references to 35
28   U.S.C. § 102 are to the pre-AIA versions of that statute.

### 3.     The Prosecution Of The '187 Patent

In 2004, following the completion of the site-absorption study, Dr. Vakily, Dr. Taneja, and Abbott attorney Paul Yasger prepared a patent application to cover Dr. Vakily and Dr. Taneja's discovery of the optimal PPI dosage form. *See* Ex. 9 (Mueller Dep. Tr.) at 43:18-44:10; *id.* at 46:6-48:5; *see also* Ex. 27 (Final Scintipharma Report dated May 18, 2004). They filed the patent application on June 16, 2004. *See* Ex. 1 ('187 patent) at p. 1. The conception date for the '187 patent is no later than March 2003.

As indicated above, TWi's inequitable conduct claim is based on its contention that the Akiyama references, which disclose the dual-dose formulation for Dexilant, are invalidating prior art to the '187 patent. This is factually incorrect.

Section 102(e) is the provision of the Patent Code regarding prior art consisting of disclosures in patent *applications* that pre-date a later invention. That section provides that a party is not entitled to a patent, *inter alia*, where "the invention was described in . . . an application for patent, published under section 122(b), by another filed in the United States *before the invention* by the applicant for patent . . . ." (emphasis added.) In other words, the patentability of a purported invention may be negated if, before that invention was made, someone else described it in a separate patent application.

Conversely, a patent is not subject to invalidation under section 102(e) if the patentee made the invention before the other party filed its patent application. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576-77 (Fed. Cir. 1996). As discussed above, the earliest effective filing date for the Akiyama references under section 102(e) is October 15, 2003. As this date is several months after the March 2003 conception date of the '187 invention, Akiyama is not prior art to the '187 patent.

Nevertheless, Takeda disclosed Akiyama I and Akiyama II to the PTO during the prosecution of the '187 patent. *See* Ex. 40 (Excerpts of '187 File History) at TAKEDA009526 (showing examiner considered Akiyama I); *id.* at TAKEDA009580 (showing examiner considered Akiyama II).

**B.     The '158 Patent**

    **1.     The Invention Of The '158 Patent**

During the clinical development of TAK-390MR (Dexilant), TAP conducted two clinical studies to explore the effect of food on the absorption of dexlansoprazole into the bloodstream following administration of TAK-390MR. *See* Ex. 5 (Charman Report) at ¶ 45. In the first study in 2004, TAP examined plasma levels for dexlansoprazole following the administration of TAK-390MR under fasted and fed conditions. *Id. ¶* 46; Ex. 37 (Clinical Study Report T-P-104-069) at TAKEDA0091532. Based on Takeda's and TAP's experience with Prevacid, TAP scientists expected that food would significantly decrease the bioavailability of dexlansoprazole. Instead, they surprisingly discovered that taking TAK-390MR with food produced a modest *increase* in the bioavailability of dexlansoprazole. Ex. 5 (Charman Report) at ¶ 47; Ex. 37 (Clinical Study Report T-P-104-069) at TAKEDA0091613-14; Ex. 10 (Mulford Dep.) at 95:9-98:12; Ex. 6 (Atkinson Dep.) at 87:4-88:7; Ex. 2 ('158 patent) at col.9 l.66 to col.10 l.34.

TAP scientists decided to conduct a second study in 2006 to evaluate the clinical relevance of the unexpected food effect observed with TAK-390MR. Ex. 5 (Charman Report) at ¶ 47; Ex. 38 (Clinical Study Report T-P106-146) at TAKEDA0093701. In this second study, TAP measured the percentage of time that intragastric pH exceeded 4 in the 24-hour post-dose period, a well-established indication of clinical efficacy for PPIs. Ex. 5 (Charman Report) at ¶¶ 50-51; *see also* Ex. 4 (Peura Report) at ¶ 32. The scientists who planned and executed the study would later become the inventors of the '158 patent. Dr. Stuart Atkinson was the medical director for the Dexilant program at TAP, and provided input into the study protocol. Ex. 6 (Atkinson Dep. Tr.) at 17:14-19:22; Ex. 38 (Clinical Study Report T-P-106-146) at TAKEDA0098278. Dr. Vakily, the primary clinical pharmacologist on the Dexilant program, and Dr. Darcy Mulford, the Senior Director of Clinical Pharmacology, designed the study protocol. Ex. 10 (Mulford Dep. Tr.) at 14:14-15:1; Ex. 8 (Lee Dep. Tr.) at 13:10-15:12. Dr. Jing-Tao Wu performed the statistical analyses, including for intragastric pH. Ex. 15 (Wu Dep. Tr.) at 12:21-15:19. Dr. Ronald Lee led the pharmacokinetic analyses and prepared the clinical study report. Ex. 8 (Lee Dep. Tr.) at 13:10-14:1. All the inventors reviewed and interpreted the study data. Ex. 6 (Atkinson Dep. Tr.) at

17:14-19:22; Ex. 10 (Mulford Dep. Tr.) at 14:14-15:1; Ex. 8 (Lee Dep. Tr.) at 13:10-15:12; Ex. 15 (Wu Dep. Tr.) at 12:21-15:19.

These scientists discovered that food had no clinically relevant effect on intragastric pH and concluded that, unlike lansoprazole and most other PPIs, which should be taken before eating, TAK-390MR can be taken without regard to food or the timing of food. *See* Ex. 5 (Charman Report) at ¶¶ 29, 34, 52; Ex. 2 ('158 patent) at col.2 ll.6-7 and col.25 ll.43-53. Based on their work, the FDA subsequently approved Dexilant for administration without regard to food. Ex. 20 (Dexilant Prescribing Information) at TAKEDA012768.

### 2.    The Prosecution Of The '158 Patent

As Lisa Mueller, the prosecuting attorney, has observed, the '158 patent discloses "a new method of treat[ment] using a known formulation." Ex. 9 (Mueller Dep. Tr.) at 80:13-19. Accordingly, the TAP inventors filed a patent application on October 12, 2007 directed to this food-neutral method of treatment.

Example 1 of the '158 patent describes the pH ranges within which the two enteric granules in the TAK-390MR formulation (the formulation tested in the second food-effect study) are released. *See id.* at col.20 l.42 to col.23 l.34 (Example 1). The study protocol and results for TAP's second food-effect study are described in Example 2. *See* Ex. 2 ('158 patent) at col.23 l.36 to col.27 l.17 (Example 2).

The claims of the '158 patent are directed to methods of treating acid reflux disease by administering to a patient a pharmaceutical composition without regard to "whether the patient is under fasted or fed conditions," or in other words, without regard to food. Ex. 2 ('158 patent) at col.28, claim 1; Claim Construction Order [D.N. 95] at 38. Claim 1 recites:

> A method of treating heartburn, acid reflux or gastroesophageal reflux disease in a patient in need of treatment thereof, the method comprising the steps of:
>
> a) obtaining a pharmaceutical composition comprising dexlansoprazole from a group of pharmaceutical compositions comprising proton pump inhibitors; and
>
> b) administering to a patient suffering from heartburn, acid reflux or gastroesophageal reflux, regardless of whether the patient is under fasted or fed conditions, a therapeutically effective amount of the

pharmaceutical composition obtained in step a), wherein the pharmaceutical composition comprises:

(i) a first solid particle, wherein said first solid particle comprises dexlansoprazole and a first enteric coating, wherein the first enteric coating releases the proton pump inhibitor from the solid particle at a pH of about 5.0 to about 5.5; and

(ii) a second solid particle, wherein said second solid particle comprises dexlansoprazole and a second enteric coating, wherein the second enteric coating releases the proton pump inhibitor from the solid particle at a pH of about 6.2 to about 6.8;

wherein the first solid particle comprises from about 15% to about 50% by weight of the pharmaceutical composition and the second solid particle comprises from about 50% to about 85% by weight of the pharmaceutical composition.

Ex. 2 ('158 patent) at col.28, claim 1. The '158 patent issued on May 8, 2012. *See id.* at p. 1.

Although Akiyama I and Akiyama II had previously disclosed the TAK-390MR formulation, no food-effect studies had been performed with dexlansoprazole at the filing date for Akiyama, and Akiyama accordingly makes no mention of the presence or absence of any food effect for the formulations it discloses. *See* Ex. 5 (Charman Report) at ¶¶ 27-29, 34. Nevertheless, Takeda disclosed Akiyama I and Akiyama II to the PTO during the prosecution of the '158 patent. *See* Ex. 39 (Excerpts of '158 File History) at TAKEDA006887 (showing examiner considered Akiyama I); *id.* at TAKEDA006862, -85 (showing examiner considered Akiyama II).

## III.   ARGUMENT

### A.   The Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 970 (Fed. Cir. 1999). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A party opposing a properly supported motion for summary judgment "'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting

1    *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). "If the evidence [opposing

2    summary judgment] is merely colorable, or is not significantly probative, summary judgment may

3    be granted." *Anderson*, 477 U.S. at 249-250.

4        **B.    No Reasonable Factfinder Could Find Inequitable Conduct On This Record.**

5        To successfully assert inequitable conduct, TWi must prove, by clear and convincing

6    evidence, that the patent applicants "misrepresented or omitted material information with the

7    specific intent to deceive" the PTO. *Therasense,* 649 F.3d at 1287 (citing *Star Scientific, Inc. v.*

8    *R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008)). After *Therasense,* a court may

9    find specific intent only if all the evidence "including evidence indicative of good faith,"

10   *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988), is

11   "sufficient to *require* a finding of deceitful intent," *Therasense,* 649 F.3d at 1290. Such culpable

12   intent exists only where the evidence shows the patent applicant "knew of the reference, knew that

13   it was material, and made a deliberate decision to withhold it." *Id.* Mere error, negligence, or even

14   gross negligence is not enough. *Id.* Although specific intent may be proved by circumstantial

15   evidence, the intent to deceive must be the only reasonable inference that can be drawn from the

16   evidence. *Id.* at 1290-91.

17       Even if deceitful intent is shown, the party claiming inequitable conduct must also show,

18   by clear and convincing evidence, that the reference about which the patent applicant intended to

19   deceive the PTO was material to patentability. "Intent and materiality are separate requirements"

20   and a court "should not use a 'sliding scale,' where a weak showing of intent may be found

21   sufficient based on a strong showing of materiality, and vice versa." *Id.* at 1290. Materiality is

22   judged under a "but for" test: allegedly misrepresented or omitted information is material only "if

23   the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at

24   1291 ("[T]he materiality required to establish inequitable conduct is but-for materiality."). The

25   lone exception is where a "patentee has engaged in affirmative acts of egregious misconduct" that

26   evince a "deliberately planned and carefully executed scheme[] to defraud the PTO and the

27   courts," in which case materiality may be presumed. *Id.* at 1291-92. Because the evidence here

28   falls far short of the requirements of knowing misconduct and "but for" materiality set forth in

*Therasense*, Takeda's motion for summary judgment on TWi's inequitable conduct defenses should be granted.

**1.    No Reasonable Factfinder Could Find That The Inventors Of The '187 Patent Engaged In Inequitable Conduct**

TWi contends that: (i) the subject matter of the '187 patent was invented by someone other than the patent's named inventors, "likely the inventors named on the Akiyama II patent"; (ii) the '187 inventors knew the Akiyama II inventors were the actual inventors of the subject matter covered by the '187 patent; and (iii) the '187 inventors intentionally misled the PTO by failing to name the Akiyama inventors. *See* Ex. 17 (Invalidity Contentions) at 119-22.[8]

There is no evidence in the record, however, upon which a factfinder reasonably could conclude either that the '187 inventors intentionally deceived the PTO about Akiyama II or any other reference, or that the information allegedly omitted or misrepresented by the '187 inventors was "but for" material. Accordingly, Takeda is entitled to summary judgment on TWi's inequitable conduct defense to its claims of infringement of the '187 patent.

**(a)    No Reasonable Factfinder Could Find That The Inventors Of The '187 Patent Specifically Intended To Deceive The PTO.**

TWi's inequitable conduct theory suffers from an obvious and glaring flaw: the patent applicants submitted to the PTO the very reference, Akiyama, that TWi claims renders the '187 patent invalid. As a matter of law, one cannot intend to conceal a reference that one freely discloses; nor can a reference be material to patentability when the Patent Examiner, being aware of the reference, nonetheless issues the patent.

To overcome these insurmountable hurdles to its inequitable conduct claim, TWi has tried to recast its claim as one involving inventorship. TWi contends that the '187 inventors engaged in inequitable conduct by stating to the PTO that they were the "original first and joint inventor[s] . .

---

[8] Although TWi's allegations with respect to the '187 and '158 patents center on allegedly false statements by the inventors to the PTO, TWi conclusorily contends that the attorneys who prosecuted the patents engaged in inequitable conduct. *See* Ex. 17 (Invalidity Contentions) at 116, 119, 122. TWi does not, however, specify any separate alleged misconduct on the part of the attorneys, or identify any evidence of deceptive intent by those attorneys. Accordingly, TWi's contentions with regard to the prosecuting attorneys also lack any evidentiary basis and cannot survive summary judgment.

1   . of the subject matter which is claimed and for which [the] patent is sought," *see* Ex. 17

2   (Invalidity Contentions) at 119, when, in fact, the Akiyama inventors made the invention. In

3   support of this contention, TWi points to three documents which allegedly show that the '187

4   inventors knew of Akiyama II and knew that it covered the same subject matter as the '187 patent.

5   *Id.* at 120-22.

6       TWi's theory that the '187 inventors engaged in nefarious and deceptive conduct in

7   claiming credit for another's invention is not only wholly speculative; it does not gibe with the

8   undisputed facts. The '187 patent, in Examples 1 and 2, discloses the two studies on which the

9   claims of the patent are based. *See* '187 Patent at col.10 l.10 to col.12 l.3. There is no dispute that

10   these were real studies, or that they were in fact performed by the '187 inventors: Dr. Vakily

11   performed the modeling disclosed in Example 1, and Dr. Vakily and Dr. Taneja executed the site-

12   absorption study disclosed in Example 2. *See, e.g.,* Ex. 12 (10/10/2014 Vakily Dep. Tr.) at 32:3-

13   16; Ex. 11 (Taneja Dep. Tr.) at 16:11-14; 122:4-22. Moreover, the claims of the '187 patent are

14   not limited to dexlansoprazole, the PPI used in all the Examples of the Akiyama references, *see*

15   Ex. 19 (Akiyama II) at col.141 ll.54-56 (introducing formulation examples with dexlansoprazole,

16   referred to as "Compound A"), but are more broadly directed to any PPI (with Examples 1 and 2

17   based on studies of the PPI lansoprazole). *See* Ex. 1 ('187 patent) at col.10 ll.16-49. The far more

18   reasonable inference to draw from these facts is that the '187 inventors (1) believed that their

19   modeling and site absorption study identified the criteria for an optimal PPI dosage form recited in

20   the claims; (2) did not know or did not believe that Akiyama II was prior art to their patent

21   application; and (3) acted in good faith by disclosing the Akiyama references to the PTO. Such

22   facts certainly cannot "require a finding of deceitful intent," as *Therasense* demands for a finding

23   of inequitable conduct.

24       In short, however TWi tries to posture its inequitable conduct theory, that theory is

25   untenable as a matter of law. TWi does not allege incorrect inventorship of the '187 patent. *See*

26   *Hess v. Advanced Cardiovascular Sys., Inc.,* 106 F.3d 976, 980 (Fed. Cir. 1997). Instead, TWi

27   contends that the '187 inventors intentionally deceived the PTO by failing to disclose the subject

28   matter of Akiyama II.

1    That contention, however, is demonstrably false. The '187 inventors withheld nothing:

2  They disclosed Akiyama I and Akiyama II to the PTO. *See* Ex. 40 (Excerpts of '187 File History)

3  at TAKEDA009526 (showing examiner considered Akiyama I); TAKEDA009580 (showing

4  examiner considered Akiyama II). Both Akiyama I and Akiyama II appear on the face of the

5  patent itself. *See* '187 Patent at p. 2. The patent examiner is presumed to have considered all

6  references listed on the face of the patent. *See* Manual of Patent Examining Procedure § 609.06

7  (noting that a "citation . . . considered by the examiner will be printed on the patent"). "An

8  applicant can not be guilty of inequitable conduct if the reference was cited to the examiner,

9  whether or not it was a ground of rejection by the examiner." *Fiskars, Inc. v. Hunt Mfg. Co.*, 221

10  F.3d 1318, 1327 (Fed. Cir. 2000).

11    Nor could TWi premise an inequitable conduct claim on a contention that the '187

12  inventors somehow intended to deceive the PTO by not disclosing their subjective opinions or

13  beliefs regarding the Akiyama II reference's effect on the patentability of the '187 patent

14  application. First, there is no factual support for any such contention. As discussed above, *see* p. 7

15  *supra*, Akiyama is not even prior art to the '187 patent. Nor is there any evidence that any of the

16  '187 inventors believed that the '187 patent covered the subject matter disclosed in the Akiyama

17  references. Indeed, TWi deposed Dr. Taneja once and Dr. Vakily twice without uncovering any

18  direct evidence that the inventors intended to deceive the PTO. *See* Exs. 11-13 (excerpts of

19  deposition transcripts). TWi's arguments to the contrary are, at best, "the thinnest of speculation."

20  *1st Media, LLC v. Electronic Arts, Inc.,* 694 F.3d 1367, 1375 (Fed. Cir. 2012)

21    Moreover, such subjective opinions about prior art references cannot form a basis for an

22  inequitable conduct claim. "An inventor's opinions regarding a prior art device known to the

23  examiner are not within the domain of material that must be submitted to the PTO." *Mentor H/S,*

24  *Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1378 (Fed. Cir. 2001); *see also Apotex Inc.*

25  *v. UCB, Inc.*, 763 F.3d 1354, 1361-62 (Fed. Cir. 2014) (an inventor has "no duty to disclose his

26  own suspicions or beliefs regarding the prior art."); *Fiskars*, 221 F.3d at 1327 (an inventor's

27  citation of "prior art defeats [the] charge that the [prior art] was withheld with deceptive intent.").

28

1

    **(b)**  **No Reasonable Factfinder Could Find That The Alleged**
          **Misrepresentations or Omissions Made to the PTO Were**

2
          **Material.**

3     TWi also cannot show that the alleged omissions and misrepresentations of the '187

4 inventors were material such that the PTO would have not granted the '187 patent "but for" the

5 inventor's alleged inequitable conduct. *See 1st Media*, 694 F.3d at 1373. As discussed above, the

6 '187 inventors disclosed both Akiyama references to the PTO, and those references appear on the

7 face of the patent. The inventors were not required to describe or explain those references, *see*

8 *Fiskars*, 221 F.3d at 1327; *Mentor H/S*, 244 F.3d at 1378, and the PTO is presumed to have

9 considered the references before granting the patent, *see Molins PLC v. Textron, Inc.*, 48 F.3d

10 1172, 1184 (Fed. Cir. 1995) ("Absent proof to the contrary, we assume that the examiner did

11 consider the references."); *see also* Manual of Patent Examining Procedure § 609.06 (a "citation . .

12 . considered by the examiner will be printed on the patent."). There is, therefore, no evidence that

13 "the PTO would not have allowed" the claims in the '187 patent "had it been aware of" the

14 Akiyama references because the PTO *was* aware of the references and it nevertheless granted the

15 '187 patent. *Therasense,* 649 F.3d at 1291.

16     Nor do the facts here come anywhere close to the circumstances in which a court will

17 bypass the materiality requirement because the patentee engaged in "egregious misconduct." In

18 *Therasense*, the Federal Circuit held that "the unclean hands doctrine remains available to supply a

19 remedy for egregious misconduct like that in the Supreme Court cases." *Id.* at 1288. Those cases

20 concerned obvious and unambiguous acts of actual or near criminality, including paying a witness

21 to file a false affidavit; manufacturing false evidence; and "suppress[ing] evidence of perjury

22 before the PTO." *Id.* at 1285-87 (discussing *Precision Instruments Mfg. Co. v. Auto. Maint. Mach.*

23 *Co.*, 324 U.S. 806 (1945); *Hazel-Atlas Glass v. Hartford-Empire Co.*, 322 U.S. 238 (1944);

24 *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933)). Here, where the inventors

25 ***actually disclosed*** the Akiyama references at issue, there is hardly the type of "'deliberately

26 planned and carefully executed scheme[]' to defraud the PTO and the courts" contemplated by

27 *Therasense*. *Id.* at 1292 (quoting *Hazel-Atlas Glass*, 322 U.S. at 245); *see also id.* at 1292-93

28

("[N]either mere nondisclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative egregious misconduct.").

### 2. No Reasonable Factfinder Could Find That the Inventors Of The '158 Patent Engaged In Inequitable Conduct

Just as with the '187 patent, TWi asserts that the inventors of the '158 patent knew that "the '158 Patent claims . . . were invented by other inventors, mostly likely the inventors named on the Akiyama II patent" and deceived the PTO by representing that they were proper named inventors of the '158 patent. *See* Ex. 17 (Invalidity Contentions) at 116-19.

TWi's argument appears to rest on the incorrect assumption that the method of treatment disclosed in the '158 patent was inherently anticipated by the disclosure of the TAK-390MR formulation in Akiyama II. *See id.* at 116, 119.[9] TWi essentially argues that, because Akiyama II disclosed a dexlansoprazole formulation that could be taken without regard to food — even though no one realized at the time of Akiyama that this formulation possessed such a property — the mere existence of that formulation precluded the '158 inventors from obtaining a patent based on their later discovery that formulations such as that disclosed in Akiyama could be administered to patients without exhibiting the food effect characteristic of other PPI formulations. In order to prevail on this theory, TWi thus not only must demonstrate that Akiyama II anticipates the '158 patent, but also must prove, by clear and convincing evidence, that the inventors, who are not lawyers, ***knew*** that this extremely complicated legal issue would ultimately be determined adversely to the patentability of the '158 invention, and intentionally deceived the PTO by failing to disclose Akiyama II. Merely to state TWi's theory is to highlight its utter implausibility.

In fact, the record shows that the inventors ***did not*** deceive the PTO. Rather, the evidence establishes that they believed that the food-effect study disclosed in Example 2 of the '158 patent led to the discovery of a new method of treatment, whereby TAK-390MR may be administered without regard to food or the timing of food — that is, at whatever time is convenient for the

---

[9] As with the '187 patent, TWi has not alleged incorrect inventorship of the '158 patent, *see Hess,* 106 F.3d at 980, and has, instead, based its inequitable conduct claim entirely on the incorrect belief that the inventors intended to deceive the PTO by failing to disclose that Akiyama II anticipated the '158 patent.

1   patient. Ex. 2 ('158 patent) at col.25 ll.51-53. There is simply no evidence from which a

2   reasonable factfinder could find that the '158 inventors intentionally deceived the PTO by

3   withholding or misrepresenting a material reference. *See Therasense*, 649 F.3d at 1290-91.

4                    **(a)**    **No Reasonable Factfinder Could Find That The Inventors Of**
                                **The '158 Patent Specifically Intended To Deceive The PTO.**

5

6          TWi can point to no evidence "sufficient to *require* a finding of deceitful intent" on the

7   part of the inventors of the '158 patent. *Id.* at 1290. The record is clear that the '158 inventors

8   believed the '158 patent covered a new method of administering an existing formulation, knew the

9   patent was based on work they had performed and reviewed, and did not intend to deceive the

10  PTO as to the existence or subject matter of the Akiyama references. *See* Ex. 8 (Lee Dep. Tr.) at

11  90:19-91:21; Ex. 15 (Wu Dep. Tr. ) at 108:6-110:3; Ex. 10 (Mulford Dep. Tr.) at 84:4-85:2; 95:9-

12  98:14; Ex. 6 (Atkinson Dep. Tr.) at 21:23-22:10.

13         Once again, TWi's inequitable conduct theory suffers from a glaring and fatal flaw: the

14  applicants disclosed to the PTO the reference that they are alleged to have concealed. The '158

15  inventors disclosed both Akiyama I and Akiyama II to the PTO. *See* Ex. 39 (Excerpts of '158 File

16  History) at TAKEDA006887 (disclosing Akiyama I); *id.* at TAKEDA006862, -85 (disclosing

17  Akiyama II). The citation of "prior art defeats [the] charge that the [prior art] was withheld with

18  deceptive intent." *Fiskars*, 221 F.3d at 1327. That is especially true here, where a cursory review

19  of the Akiyama references would reveal that they disclosed formulations similar to those described

20  in the '158 patent. Akiyama claims a dexlansoprazole pharmaceutical composition with two solid

21  particles, the first solid particle having an "enteric coat such that the active ingredient is released

22  in the pH range of no less than 5.0 to no more than 6.0," and the second solid particle having an

23  enteric coat that "is soluble in the pH range of 6.0 to 7.5" — pH ranges that encompass the pH

24  ranges for the two solid particles disclosed in claim 1 of the '158 patent. Ex. 19 (Akiyama II) at

25  cols.162-164 (claims 1 and 4); Ex. 18 (Akiyama I) at 367-369 (claims 41 and 44). In other words,

26  mere comparison of the two references clearly shows that the invention of the '158 patent was the

27  discovery and description of the absence of a food effect for the dexlansoprazole formulations it

28

describes — not the formulations themselves — and the claiming of a novel method of treatment based on this newly-discovered property.

As stated in the patent, the invention of the '158 patent is the discovery that the

> modest increase in TAK-390 exposure [i.e., dexlansoprazole plasma levels] following administration of TAK-390MR under various fed conditions compared with fasting state . . . did not produce relevant differences in intragastric pH. The pH results indicate that TAK-390MR can be administered without regard to food or the timing of food.

Ex. 2 ('158 Patent) at col.25 ll.43-53. In other words, as the attorney who prosecuted the '158 patent noted, the '158 inventors "viewed [the '158 patent] as a new method of treating using a known formulation." Ex. 9 (Mueller Dep. Tr.) at 80:17-19. The evidence supports the reasonable inference that this was, in fact, the '158 inventors' belief and that they therefore lacked the intent to deceive the PTO. *See, e.g.*, Ex. 10 (Mulford Dep. Tr.) at 84:4-85:2; 95:9-98:14.

To the extent that TWi contends that the '158 inventors committed inequitable conduct in not drawing the PTO's attention to the Akiyama II reference and explaining precisely how the '158 patent related to the formulation disclosed in Akiyama II, TWi seeks to impose obligations far beyond those that the PTO or the courts have ever imposed. As noted previously, patent applicants are not required to divulge their "own suspicions or beliefs" regarding prior art references. *Apotex*, 763 F.3d at 1361-62; *see also Mentor H/S*, 244 F.3d at 1378. Nor is there any evidence in the record that any of the '158 inventors considered Akiyama to be material to the patentability of their separate and distinct food-effect invention.

> **(b)**     <u>**No Reasonable Factfinder Could Find That The Alleged Misrepresentations or Omissions Made to the PTO Were Material.**</u>

TWi also cannot demonstrate that the '158 inventors withheld any information material to patentability of the '158 patent. TWi contends that Akiyama II anticipates the '158 patent. However, the '158 inventors disclosed the Akiyama references, which appear on the face of the patent itself. The fact that the Examiner was aware of Akiyama II and nonetheless issued the '158 patent conclusively demonstrates that he did not consider it an impediment to the patentability of

1  the '158 patent. There thus can be no reasonable argument that "the PTO would not have allowed"

2  the claims in the '158 patent "had it been aware of" Akiyama II. *Therasense*, 649 F.3d at 1291.

3        Finally, as with the '187 patent, there is no evidence of a "'deliberately planned and

4  carefully executed scheme[]' to defraud the PTO and the courts." *Id.* at 1292 (quoting *Hazel-Atlas*

5  *Glass*, 322 U.S. at 245). The most 'egregious' action that TWi can conjure up is the '158

6  inventors' failure to explain the disclosure of TAK-390MR in Akiyama II to the PTO. Ex. 17

7  (Invalidity Contentions) at 116. As noted in the discussion of the '187 patent, this does not come

8  close to the type of criminal or near-criminal conduct necessary to justify waiver of the materiality

9  requirement. Accordingly, summary judgment is appropriate on this ground as well

10 **IV.**    **CONCLUSION**

11       For the foregoing reasons, Takeda respectfully requests that the Court find that there is no

12 material issue of fact to support TWi's allegations of inequitable conduct, and grant summary

13 judgment in Takeda's favor on TWi's Ninth and Tenth Affirmative Defenses in its Answer to the

14 Second Amended Complaint for Patent Infringement.

15

16                         Respectfully submitted,

17 DATED: February 19, 2015       MUNGER, TOLLES & OLSON LLP
                                      HEATHER E. TAKAHASHI

18

19

20                         By:       */s/ Heather E. Takahashi*
                              HEATHER E. TAKAHASHI

21

22                        Attorneys for Plaintiffs
                       TAKEDA PHARMACEUTICAL CO., LTD.,

23                        TAKEDA PHARMACEUTICALS U.S.A., INC., AND
                       TAKEDA PHARMACEUTICALS AMERICA, INC.

24

25

26

27

28

TAKEDA'S MOTION FOR SUMMARY JUDGMENT