Don J. Mizerk (SBN 208477)
*don.mizerk@huschblackwell.com*
HUSCH BLACKWELL LLP
120 S. Riverside Plaza, Suite 2200
Chicago, IL 60606
Telephone: (312) 655-1500
Facsimile: (312) 655-1501

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

TAKEDA PHARMACEUTICAL CO., LTD.,
TAKEDA PHARMACEUTICALS U.S.A.,
INC., AND TAKEDA
PHARMACEUTICALS AMERICA, INC.,

                Plaintiffs,

                v.

TWI PHARMACEUTICALS, INC.,

                Defendant.

Case No. 5:13-CV-2420 LHK

**DEFENDANT TWI'S RESPONSE TO
TAKEDA'S MOTION FOR SUMMARY
JUDGMENT REGARDING
INEQUITABLE CONDUCT**

Date:        April 9, 2015
Time:        1:30 p.m.
Courtroom:  8
Judge:     Hon. Lucy H. Koh

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

I.  INTRODUCTION ......................................................................................................... 1

II. LEGAL STANDARD .................................................................................................... 2

    A.  The Standard For Inequitable Conduct ............................................................ 2

        1.  *Materiality Is Determined Based On The PTO's Preponderance Of The Evidence Standard.* ......................................................................... 2

        2.  *Intent To Deceive Can Be Proven By Circumstantial Evidence.* ......................... 3

    B.  All Reasonable Inferences, Including Inferences Regarding Materiality And Intent To Deceive The PTO, Must Be Made In TWi's Favor At Summary Judgment. ........................................................................................ 3

III. THE '187 PATENT INVENTORS COMMITTED INEQUITABLE CONDUCT. ............. 4

    A.  Factual Background ......................................................................................... 4

    B.  The '187 Patent Inventors' Misstatements To The PTO Regarding First Inventorship Were Material To Patentability. ..................................................... 8

    C.  The Evidence Is Sufficient To Support A Finding That The '187 Patent Inventors Intended To Deceive The PTO. ...................................................... 10

IV. THE '158 PATENT INVENTORS COMMITTED INEQUITABLE CONDUCT. ........... 11

    A.  Factual Background ....................................................................................... 11

    B.  The Failure To Disclose That The Formulation Tested Was Already Patented Was Material To Patentability. .......................................................... 15

    C.  The Partial Disclosure Of Akiyama Demonstrates Intent To Deceive. ......................... 16

V.  CONCLUSION ......................................................................................................... 18

# TABLE OF AUTHORITIES

**Page**

## CASES

*Advanced Magnetic Closures, Inc.*,
   607 F.3d 817 (Fed. Cir. 2010).................................................................. 10

*Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*,
   768 F.3d 1185 (Fed. Cir. 2014)......................................................... 3, 4, 20

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).................................................................................. 2

*Apotex Inc. v. UCB, Inc.*,
   763 F.3d 1354 (Fed. Cir. 2014).......................................................... 4, 20

*Aventis Pharma S.A. v. Hospira, Inc.*,
   675 F.3d 1324 (Fed. Cir. 2012).......................................................... 4, 20

*Avocent Redmond Corp. v. Raritan Ams., Inc.*,
   921 F.Supp. 2d 229 (S.D.N.Y. 2013)....................................................... 19

*Gen. Elec. Co. v. Mitsubishi Heavy Indus. Ltd.*,
   946 F.Supp. 2d 582 (N.D. Tex. 2013) ..................................................... 18

*Halo Electronics, Inc. v. Pulse Elecs, Inc.*,
   769 F.3d 1371 (Fed. Cir. 2014)................................................................. 2

*Helferich Patent Licensing, LLC v. New York Times Co.*,
   __ F.3d. __,  2015 WL 527851 (Fed. Cir. Feb. 10, 2015) ......................... 2

*Intellect Wireless, Inc. v. HTC Corp.*,
   732 F.3d 1339 (Fed. Cir. 2013)............................................................... 12

Interwoven, Inc. v. Vertical Computer Sys.,
   No. 10-04645, 2013 WL 75770 (N.D. Cal. Jan. 4, 2013)........................... 5

*Kingsland v. Dorsey*,
   338 U.S. 318 (1949)................................................................................ 18

*LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*,
   958 F.2d 1066 (Fed. Cir. 1992).............................................................. 18

*Leviton Mfg. Co., Inc. v. Shanghai Meihao Elec., Inc.*,
   613 F.Supp. 2d 670 (D. Md. 2009).......................................................... 11

*Leviton Mfg. Co., Inc. v. Universal Security Instruments, Inc.*,
   606 F.3d 1353 (Fed. Cir. 2010).............................................................. 11

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*,
    275 F.3d 1347 (Fed. Cir. 2001)............................................................................................ 18

*Modine Mfg. Co. v. Allen Group, Inc.*,
    917 F.2d 538 (Fed. Cir. 1990)............................................................................................. 11

*Ohio Willow Wood Co. v. Alps S., LLC*,
    735 F.3d 1333 (Fed. Cir. 2013)................................................................................... 3, 4, 12

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.*,
    695 F.3d 1285 (Fed. Cir. 2012)........................................................................................ 1, 11

*Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*,
    359 F. Supp. 948 (S.D. Fla. 1972), *aff'd*, 479 F.2d 1338 (5th Cir. 1973)....................... 12

*PerSeptive Biosys., Inc. v. Pharmacia Biotech, Inc.*,
    225 F.3d 1315 (Fed. Cir. 2000)............................................................................................ 10

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach Co.*,
    324 U.S. 806 (1945).............................................................................................................. 18

*Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*,
    204 F.3d 1368 (Fed. Cir. 2000)....................................................................................... 4, 20

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*,
    758 F.2d 613 (Fed. Cir. 1985)............................................................................................. 11

*TecSec, Inc. v. International Business Machines Corp.*,
    763 F.Supp. 2d 800 (E.D. Va. 2011) .................................................................................. 10

*Therasense v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011)...................................................................................... passim

*TV Interactive Data Corp. v. Sony Corp.*,
    No. 10-0475, 2012 WL 6020113 (N.D. Cal. Dec. 3, 2012)................................................. 5

*Worldwide Home Prods, Inc. v. Bed, Bath and Beyond, Inc.*
    ___ F.3d ___, 2015 WL 568710 (S.D.N.Y. Feb. 11, 2015).......................................... 20, 21

## STATUTORY AUTHORITIES

35 U.S.C. § 102.......................................................................................................................... 16

## RULES AND REGULATIONS

37 C.F.R. § 1.56(a).................................................................................................................... 16

37 C.F.R. § 1.56(b) ..................................................................................................................... 8

TWI'S RESPONSE TO TAKEDA'S MOTION
FOR SUMMARY JUDGMENT
CASE NO. 5:13-CV-2420 LHK

Fed. R. Civ. P. 56(a) ............................................................................................................ 2

MPEP § 2001.04 .................................................................................................................. 8

MPEP § 2004 ....................................................................................................................... 10

MPEP § 2112 ....................................................................................................................... 16

TWI'S RESPONSE TO TAKEDA'S MOTION
FOR SUMMARY JUDGMENT
CASE NO. 5:13-CV-2420 LHK

# I.       **INTRODUCTION**

Takeda has moved for summary judgment on TWi's defenses that the '187 and '158 patents are unenforceable due to inequitable conduct.  Takeda, however, has forgotten the fundamental premise of a summary judgment motion – the facts upon which it relies must be undisputed or construed in the light most favorable to the nonmovant, here, TWi.  Takeda's motion conveniently ignores the facts obtained through discovery in this case, including the 600,000 pages of TAP documents that Takeda failed to timely produce in this case or the prior litigation.

As is set forth below, the inventors of the '187 patent submitted a declaration to the PTO stating that they were the "first" inventors of the claimed invention.  However, the inventors admitted at their deposition that they were not the first to invent what they claimed and they knew it.  Nevertheless, they submitted and never corrected the false declaration, because if they had, the PTO would not have even further considered their application for a patent.  *Outside the Box Innovations, LLC v. Travel Caddy*, *Inc.*, 695 F.3d 1285, 1294 (Fed. Cir. 2012) (a false declaration is "per se material").  Patent attorney Lisa Mueller was aware of the same facts and therefore also knew that the declaration was false, yet submitted it anyway.  The only reason to submit a false declaration to the PTO was to mislead the PTO into wrongfully examining and granting the patent.  No other explanation has been offered.

The TAP inventors and attorney Mueller also committed inequitable conduct in prosecuting the '158 patent by failing to disclose and actively concealing from the PTO that the test results disclosed in the '158 patent were obtained from tests performed on the specific drug formulation disclosed in the prior art '755 patent.  The '158 patent inventors and Mueller knew that these results were obtained from the prior art '755 patent formulation, that there was <u>no way</u> for the PTO to know that these test results were from the prior art '755 patent formulation, and they doctored the formulation information presented in the '158 patent to conceal that the drug formulation was from the prior art '755 patent.  This information was clearly material and their affirmative actions to hide it from the PTO and mislead the PTO that this was an original drug formulation demonstrate the requisite intent to deceive by the '158 patent inventors and Mueller.

Taking every factual inference in TWi's favor as is required, Takeda's motion is clearly without basis and should be denied.

## II.    LEGAL STANDARD

"Summary judgment requires that there be no reasonably disputed facts capable of altering the outcome." *Helferich Patent Licensing, LLC v. New York Times Co.*, __ F.3d. __,  2015 WL 527851, at *4 (Fed. Cir. Feb. 10, 2015).  At this stage of the proceedings "all justifiable inferences" must be made in the nonmovant's favor.[1]  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1377 (Fed. Cir. 2014) (citing Fed. R. Civ. P. 56(a) and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).  Takeda ignores these black-letter rules and argues that, in order for TWi to defeat Takeda's motion for summary judgment of no inequitable conduct, TWi must prove that the "*only* reasonable inference" is that the inventors or their agents intended to deceive the PTO. (Pls. Br. at 11 (emphasis added).)  Takeda's position is incorrect as a matter of law.  Here, where TWi can show that material misstatements and omissions were made by the inventors and their agents, and where a reasonable reading of the facts can lead to the conclusion that the misstatements and omissions were made for the purposes of achieving patentability, Takeda cannot prevail on summary judgment of no inequitable conduct.

### A.    The Standard For Inequitable Conduct

Inequitable conduct is an equitable defense to patent infringement.  *Therasense v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011).  TWi can prove inequitable conduct by showing that "the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013).  Intent and materiality must be separately established.  *Therasense*, 649 F.3d at 1290.

#### 1.    *Materiality Is Determined Based On The PTO's Preponderance Of The Evidence Standard.*

This Federal Circuit held in *Therasense* that the standard for "the materiality required to establish inequitable conduct is but-for materiality." 649 F.3d at 1291. Undisclosed prior art is "but-for material if

---

[1] Takeda also relies in making its motion on the expert report of Dr. Peura. (Pls. Br. at 2, 5, and 8; *see also* Pls. Ex. 4.) This is improper as Takeda agreed that Dr. Peura's report only related to obviousness and thus it is not evidence in this case. (Mizerk Decl. Ex. V, Dec. 18, 2014 email from D. Mizerk to H. Takahashi.) Takeda's motion should be denied for this reason alone.

2                    TWi's Response To Takeda's Motion
For Summary Judgment
Case no. 5:13-cv-2420 lhk

the PTO would not have allowed a claim had it been aware of" it. *Id.* This means that to assess materiality, the court must look to the preponderance of the evidence standard used by the PTO to allow claims during examination. *Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 768 F.3d 1185, 1189 (Fed. Cir. 2014) (citing *Therasense*, 649 F.3d at 1291-92 ("The court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction.").  "[E]ven if a district court does not invalidate a claim based on a deliberately withheld reference, the reference may be material if it would have blocked patent issuance under the PTO's different evidentiary standards." *Id.* Because TWi can show that the inventors and/or their agent's misstatements were material to the PTO's review of the TAP inventors' patent applications, this factor has been met.

### 2.    *Intent To Deceive Can Be Proven By Circumstantial Evidence.*

Because direct evidence of deceptive intent is rare, the court "may infer intent from indirect and circumstantial evidence." *Therasense*, 649 F.3d at 1290.  "Partial disclosure of material information about the prior art to the PTO cannot absolve a patentee of intent if the disclosure is intentionally selective." *Am. Calcar*, 768 F.3d at 1190 (citing *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1335–36 (Fed. Cir. 2012); *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1376 (Fed. Cir. 2000) (finding intent where the patentee disclosed a complete reference in Japanese but did not provide translations of that part which was material to patentability);  *Apotex Inc. v. UCB, Inc.*, 763 F.3d 1354, 1362 (Fed. Cir. 2014) (finding intent on the basis of an inventor misrepresenting material information about disclosed prior art)).

### B.    **All Reasonable Inferences, Including Inferences Regarding Materiality And Intent To Deceive The PTO, Must Be Made In TWi's Favor At Summary Judgment.**

At this stage of the proceedings TWi need only show that the facts are reasonably in dispute and that the facts could support the conclusion that the inventors or their agents failed to provide material information and/or intended to deceive the PTO with materially false information. *See Ohio Willow Wood*, 735 F.3d at 1345 (reversing summary judgment finding of no inequitable conduct because "there are genuine issues of material fact regarding whether [the patentee] committed inequitable conduct"); *id.* at 1351 ("The facts, when viewed in a light most favorable to [the defendant], preclude summary judgment on the issue of deceptive intent.").  In similar cases in this jurisdiction, district courts have

TWi's Response To Takeda's Motion
For Summary Judgment
Case no. 5:13-cv-2420 lhk

likewise held that "intent remains a fact that must be found by the trier of fact. It is enough to defeat summary judgment that a question remains as to the inventor's credibility." *Interwoven, Inc. v. Vertical Computer Sys.*, No. 10-04645, 2013 WL 75770, at *4 (N.D. Cal. Jan. 4, 2013); *TV Interactive Data Corp. v. Sony Corp.*, No. 10-0475, 2012 WL 6020113, at *27 (N.D. Cal. Dec. 3, 2012) (denying motion for summary judgment of no inequitable conduct because "the evidence provided by Sony, while insufficient to prove inequitable conduct, is arguably sufficient to raise disputed issues of fact as to this defense"). Because of the summary judgment standard on inferences being read in the light most favorable to TWi, Takeda's recitation of the "only reasonable inference" trial standard is inapposite. *See* Fed. R. Civ. P. 56(a). Because TWi can, at a minimum, present a reasonable dispute regarding the intent of the inventors and their agents to deceive the PTO, summary judgment is not proper.

### III. THE '187 PATENT INVENTORS COMMITTED INEQUITABLE CONDUCT.

The '187 patent inventors and their counsel knew that someone else invented and patented the same invention before they even conceived of it, but nevertheless filed a patent application proclaiming to be the first to invent it. In support of that application the '187 patent inventors and their counsel filed a declaration in which they swore they were the "first" to invent their claimed invention. The '187 patent inventors' declarations constituted material misstatements to the PTO regarding inventorship, and there is simply no reason for them to have filed the false declarations other than to deceive the PTO into examining and giving them a patent. This is inequitable conduct.

#### A.    Factual Background

Takeda alleges (without support) that the '187 patent inventors conceived of their invention, a two-pulse formulation of a PPI, in March 2003.[2] (Pls. Br. at 7.) A provisional application was filed in June 2004. (Mizerk Decl. Ex. A, '187 patent.) The problem with this is that both inventors, who were TAP employees, sat in a meeting in May of 2003 and viewed a presentation by Takeda showing that

---

[2] As set forth in TWi's motion for summary judgment, the '187 patent inventors admitted that they did not conceive of the claimed invention until no earlier than December 2003. (D.I. 143 at 10.) Moreover, the resolution of the conception date issue was for the PTO, not Takeda, to determine and is further evidence from which to infer the inventors and their attorney's intent to deceive the PTO.

4                                TWi's Response To Takeda's Motion
For Summary Judgment
Case no. 5:13-cv-2420 lhk

someone else had invented the same thing in January of 2003—two months before their alleged conception date.  In fact, when asked at his deposition about this inconsistency, inventor Dr. Vakily testified that he turned to the other inventor, Dr. Taneja, and asked "is this our stuff"?  (Mizerk Decl. Ex. C, Vakily Dep. at 149:4-150:23.) It was quickly apparent that it was not "their stuff" and had been invented earlier by Dr. Akiyama and his team at Takeda Japan, who had already conducted clinical trials with the formulation.  (Mizerk Decl. Ex. D, Vakily Dep. Ex. 1330 at TAKEDA0971664 (RCP-002 protocol).)  Drs. Vakily and Taneja and their attorney also knew that Dr. Akiyama and his team had already filed a patent for their formulation as early as October 2002.  (Mizerk Decl. Ex. E, Mueller Dep at 55:12-21; Mizerk Decl. Ex. F, TAKEDA0850085; Mizerk Decl. Ex. G, TAKEDA1057443.)  And in any event, Akiyama became § 102(e) prior art on October 15, 2003, long before the provisional application was filed.  Despite sitting in a meeting and being surprised to find out someone had independently developed their claimed formulation before they had even conceived of it, Drs. Vakily and Taneja subsequently filed a patent application and submitted a declaration to the PTO swearing that they had invented the claimed formulation "first."

The '187 patent inventors acknowledge that TAK-390MR was administered to humans by Takeda as early as January and February 2003 in the RCP-002 study.  (Mizerk Decl. Ex. C, Vakily Dep. at 155:15-156:1.)  It is undisputed that TAK-390MR is an embodiment of the '187 patent.  (Mizerk Decl. Ex. C, Vakily Dep. at 95:4-14.)  It is further undisputed that the '187 patent inventors were provided with the formulation information for TAK-390MR used in study RCP-002.[3]

The '187 patent inventors acknowledged at deposition that they attended a May 2003 "MCM meeting" where they were "surprised" by the RCP-002 data, which showed clinical test results conducted by Takeda using the formulation the '187 patent inventors claimed to invent, but before they claimed to invent it:

---

[3] While it is true that the formulation data was initially redacted from materials provided to the TAP inventors, it is beyond dispute that they did eventually receive the data, long before the issuance of either patent-in-suit.  (Mizerk Decl. Ex. D, TAKEDA0971671 (August 12, 2003 version to Dr. Vakily with formulation information redacted); Mizerk Decl. Ex. H, TAKEDA0899413 (March 23, 2004 document to Dr. Vakily with formulation data included).) In fact, one could infer that the initial redaction of the information only served to further highlight its importance when it was provided to the TAP inventors prior to filing the '187 patent.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

Q.  And so I guess were you at the MCM meeting that took place?

A.  Yes.  I was as a, sort of an observer in the back, yes.

Q.  So --

A.  Not as part of MCM.                                    `

Q.  And so that was the big meeting where they showed you the RCP-002 data and some
    of the other data?

A.  Yes, the executive management of Abbott, Takeda, and TAP was there, so they
    review the projects, and one of the projects was that Japan all of a sudden presented
    this.

Q.  And when they presented this, was it your understanding that it was a two-pulse
    formulation?

A.  Well, when they presented, first I thought that they are presenting my simulations
    because it was surprise to me. And then, because **I distinctly remember, I asked Raj
    [Taneja, co-inventor of the '187 patent], what, is this our stuff, and then we
    notice that they did the clinical study they're presenting.**

Q.  Sure. So that clinical study was RCP-002?

A.  Two, I believe, yes.

Q.  And so if you look further down in that e-mail there was a request for the individual
    patient plasma data for the RCP-002 study?

A.  Yes.

Q.  And did you eventually receive that data?

A.  I believe so . . . .

18  (Mizerk Decl. Ex. C, Vakily Dep. at 149:4-150:23 (emphasis added); *see also* Mizerk Decl. Ex. I,

19  Vakily Dep. Ex. 1320 (post-meeting questions for Takeda Japan from the '187 inventors).)

20      The meeting minutes and powerpoint from the May 6, 2003 meeting make it clear what Takeda

21  Japan had invented.  The minutes, *which were reviewed and edited by the '187 patent inventors* state:

22  "Dr. Kikuta [from Takeda] reviewed the results of study RCP-002 comparing TAK-390 60mg modified

23  release (TAK-390 MR-A,D) formulation to TAK-390 60 mg capsules and esomeprazole 40 mg. TAK-

24  390MR-D formulation maintained plasma concentrations  >100 ng/mL for 9.4 hours in 7/8 subjects.

25  Two drug peaks were obtained at about 2 and 8 hours post dose."  (Mizerk Decl. Ex. J at

26  TAKEDA0767477.)  The '187 patent inventors requested, and eventually received, the data from the

27  RCP-002 under strict terms of confidentiality from Takeda.  (Mizerk Decl. Ex. D, Vakily Dep. Ex.

28

1330.)  The '187 patent inventors further admitted that this RCP-002 data showed that TAK-390MR met the elements of their purported invention:

> Q. And from that PK data were you able to determine that it was a two-pulse formulation?
>
> A. Yes. You can distinctly see that.
>
> Q. And from that PK data were you able to determine that the first and second peak both exceeded 100 nanograms per milliliter?
>
> A. Yeah, I believe you could see that, but I have to go back and look it. I don't recall exactly from memory.
>
> Q. And based on that deconvolution were you able to determine that the first and second peak were separated by a period of time?
>
> A. Yes. It's distinct. You can see that.
>
> Q. Do you recall if they were separated by more than two hours?
>
> A. I believe so, but we will -- I don't remember. I have to see that. I think it was.

(Mizerk Decl. Ex. C, Vakily Dep. at 152:4-20.)  Furthermore, when discussing RCP-002, the '187 patent inventors admitted that TAK-390MR was given to patients before they conceived of their invention:

> Q. And it's your understanding that this protocol was used in clinical trials that took place in January 2003 in Germany?
>
> A. Yes. Takeda did that, Takeda, yeah.
>
> **Q. So someone had made a two-pulse formulation separated by a period of time and administered it to a human other than you as of January 2003?**
>
> **A. Yes.**

(*Id.* at 117:19-178:10 (emphasis added); *see also* Mizerk Decl. Ex. D, Vakily Dep. Ex. 1330 at TAKEDA0971664 (RCP-002 protocol); Mizerk Decl. Ex. K at DEX0540839 (May 6, 2003 Meeting Minutes).)  Moreover, not only did the '187 patent inventors know about the earlier testing, they provided an in-depth analysis of the results of RCP-002 testing (in both prose and powerpoint) to their superiors at TAP long before filing their provisional patent application.  (Mizerk Decl. Ex. L, Vakily Dep. Ex. 1333; Mizerk Decl. Ex. M, Vakily Dep. Ex. 1335.)  In that analysis inventor Vakily explicitly states that the TAK-390MR given in RCP-002 met all of the parameters that TAP had set for a working formulation.  (*Id.*)  Finally, the inventors and their agent received an explicit disclosure of the formulation used in the RCP-002 study at least by March 2004, months before they filed their provisional application.  (Mizerk Decl. Ex. H at TAKEDA0899414; Mizerk Decl. Ex. N at

TAKEDA0735924.)[4]  These admissions lead to one simple conclusion, succinctly stated by the '187 patent inventors:

> Q. **So independently TAK-390MR already exhibited the same characteristics that you independently came up with in your PK-PD formulation?**
>
> A: Modeling.
>
> Q. The answer to my question is yes?
>
> A: **I guess so, yes.**

(Mizerk Decl. Ex. C, Vakily Dep. at 95:4-14 (objections omitted) (emphasis added).)

The evidence and the '187 patent inventors' own testimony show that an embodiment of their purported invention already existed before any alleged conception date, and that the '187 patent inventors knew this before they filed their provisional application in June 2004.  It is also undisputed that the inventors (belatedly) signed a declaration submitted to the PTO in *2008* stating that "I believe I am . . . an original, *first*, and sole inventor . . . of the subject matter claimed." (Mizerk Decl. Ex. P, TAKEDA012476 (emphasis added).)  It is also undisputed that the inventors' agent listed Akiyama, whose underlying U.S. application was published in 2006, in a disclosure statement in November of 2012 and never mentioned it again.  (Mizerk Decl. Ex. Q, Nov. 21, 2012 IDS.)

**B.    The '187 Patent Inventors' Misstatements To The PTO Regarding First Inventorship Were Material To Patentability.**

Takeda acknowledges that TWi's inequitable conduct defense is based, in part, on the fact that "the inventors of the patents-in-suit . . . are not the true inventors of the claimed subject matter of those patents." (Pls. Br. at 1.)  Despite this, and despite the facts and admissions described above, Takeda argues that there is no material misstatement to the PTO because the '187 patent inventors disclosed the Akiyama references in their application.  (*Id.* at 7.)  This argument misses the mark.  The material misstatement occurred when the '187 patent inventors professed to have invented something for which a patent had already been sought.  (*See supra* at 4-8.)

---

[4] While it is true that Takeda attempted to control who at TAP could view the formulation information, the '187 patent inventors were named on an explicit list that allowed them to see everything related to TAK-390MR.  (Mizerk Decl. Ex. O, Vakily Dep. Ex. 1328.)

8                                  TWi's Response To Takeda's Motion
For Summary Judgment
Case no. 5:13-cv-2420 lhk

Misstatements regarding inventorship are the epitome of materiality and often serve as the basis for inequitable conduct claims.  "As a critical requirement for obtaining a patent, inventorship is material."  *PerSeptive Biosys., Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000); *see also* MPEP § 2001.04 ("Materiality is defined in 37 C.F.R. § 1.56(b) ... [and] includes, for example, information on ... prior invention by another, inventorship conflicts, and the like.").  "The proper inventorship of a claimed invention is highly material to patentability, and misrepresentations regarding inventorship, if true, could easily render a patent unenforceable due to inequitable conduct."  *TecSec, Inc. v. International Business Machines Corp.*, 763 F.Supp. 2d 800, 811-12 (E.D. Va. 2011) (citing *Advanced Magnetic Closures, Inc.*, 607 F.3d 817, 830 (Fed. Cir. 2010) (citing *PerSeptive Biosys.*, 225 F.3d at 1321); *see also Leviton Mfg. Co., Inc. v. Shanghai Meihao Elec., Inc.,* 613 F.Supp. 2d 670, 695-96 (D. Md. 2009) (holding that representations regarding inventorship can be material); *Modine Mfg. Co. v. Allen Group, Inc.,* 917 F.2d 538, 541-42 (Fed. Cir. 1990); *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 623-24 (Fed. Cir. 1985).[5]

Here, where the '187 patent inventors knew that someone else had invented what they claimed before they did, yet provided a declaration stating they were the first inventors, there is no question of materiality. A false affidavit or declaration is "per se material."  *Outside the Box Innovations*, 695 F.3d at 1294.  The only reason to file the affidavit in question is to get a patent; in fact the PTO will not grant the patent without it.  If the issue had been brought to the attention of the examiner, the PTO could have engaged in an analysis of which set of inventors had conceived of the invention first.  The '187 patent inventors did not want that to happen, because they already knew the answer—the Akiyama inventors had made a formulation of TAK-390MR months before the TAP inventors had even conceived of it. This evidence clearly meets the PTO's "preponderance of the evidence standard" and in fact far exceeds it.  By failing to inform the PTO of the material fact that *someone else had invented their claimed invention first*, the TAP inventors were able to secure a patent when they should not have.

---

[5]To the extent that Takeda wishes to argue that TAP and Takeda were actually one entity, it is also material inequitable conduct that Takeda filed a separate patent for the same invention.  *Leviton Mfg. Co., Inc. v. Universal Security Instruments, Inc.*, 606 F.3d 1353, 1360 (Fed. Cir. 2010) ("Had the examiner been aware that different Leviton employees each claimed to be first inventors of the same subject matter recited in the same claims, it would have raised serious questions regarding inventorship—an issue that is clearly material to patentability.") .

TWI'S RESPONSE TO TAKEDA'S MOTION
FOR SUMMARY JUDGMENT
CASE NO. 5:13-CV-2420 LHK

**C.     The Evidence Is Sufficient To Support A Finding That The '187 Patent Inventors Intended To Deceive The PTO.**

Takeda and TWi agree on one legal point—to succeed on an inequitable conduct defense a party need not come forward with "smoking gun" evidence that the inventors or their agents intended to deceive the PTO.  "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence" on a motion for summary judgment or after a trial. *Therasense*, 649 F.3d at 1290.  Here, the Court is faced with a simple question, if it is true that the '187 patent inventors knew that they were not the first to invent what they claimed, what possible reason could they have to sign a declaration stating they were?  Takeda offers no alternative motivation.  There is no other reasonable conclusion—the '187 patent inventors intended to deceive the PTO.  *See Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1345 (Fed. Cir. 2013) (submission of false affidavit "raises a strong inference of intent to deceive"). Stated another way, "a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that falsehood will affect issuance of the patent." *Therasense*, 649 F.3d at 1292.  Moreover, given the procedural posture of Takeda's motion, "misrepresentations and misleading statements that were directly refuted by credible evidence . . . create[] a genuine issue of material fact" regarding intent.  *Ohio Willow Wood*, 735 F.3d at 1351.[6]

TWi has shown that the '187 patent inventors made statements to the PTO regarding inventorship that they knew were false.  There is no plausible excuse for their behavior other than an attempt to deceive the PTO into giving them a patent; therefore the circumstantial evidence, viewed in the light most favorable to TWi, demonstrates the requisite intent.

---

[6] Takeda's asserts that by providing the Akiyama patent to the PTO, they discharged their duty of candor.  (Pls. Br. at 16-17.)  Takeda is mistaken.  The inventors and their attorney knew that the Akiyama invention was the same as what they claimed as theirs and predated their application.  Thus, they knew their declaration, stating they were "first," was false.  Burying the reference in the laundry list of prior art cited to the examiner, under the present circumstances, does not absolve them of the false statement.  *See* MPEP § 2004;  *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F. Supp. 948, 964-65 (S.D. Fla. 1972),  *aff'd*, 479 F.2d 1338 (5th Cir. 1973) ("Obviously, the purpose of this misrepresentation was to bury the Wollard patent in a long list of allegedly old prior art patents in the hope that the Patent Examiner . . . would ignore the list and permit the . . . patent to issue. Such conduct clearly violates the required standard of candor and fair dealing with the Patent Office. Stuart had a clear obligation to call the  . . . patent to the attention of the Patent Office in a proper fashion  . . . .")

Because TWi has submitted evidence sufficient to support a finding that the '187 patent inventors' false statements were material to patentability and were intended to deceive the patent office into granting the patent, Takeda's motion for summary judgment of no inequitable conduct regarding the '187 patent should be denied.

## IV.   THE '158 PATENT INVENTORS AND THEIR COUNSEL COMMITTED INEQUITABLE CONDUCT.

Takeda begins its argument regarding TWi's allegations of inequitable conduct on the '158 patent with a substantial (and legally incorrect) straw man, namely that "not only must TWi demonstrate that Akiyama II anticipates the '158 patent, but also must prove… that the inventors, who are not lawyers, ___**knew**___ this extremely complicated legal issue. . . ." (Pls. Br. at 16.)  Takeda piles on by stating that "[m]erely to state TWi's theory is to highlight its utter implausibility." (*Id.*)  Takeda again misses the point.  The inventors—and their counsel—purposely concealed that the drug formulation tested in the '158 patent and upon which the entire application was based was already disclosed in Akiyama. Without this critical information, PTO could not even consider this purported "extremely complicated legal issue."  They knew what they did was deceptive and there is no requirement that they specifically appreciate the gravity of their deception—although their attorney certainly did.  A review of the facts in the light most favorable to TWi clearly supports a finding of inequitable conduct.

### A.   Factual Background

The application that became the '158 patent was filed on October 12, 2007.  (Mizerk Decl. Ex. B, '158 patent at (60).)  The '158 patent uses the known TAK-390MR formulation (disclosed in Akiyama) to treat a patient without regard to meals.  The '158 patent inventors claim that they determined that this formulation could be used without regard to meals by conducting the study described in the '158 patent.  (Pls. Br. at 8.)  The inventors, of course, knew which formulation was used in their study.  The disclosure in the patent is shown on the left, and the actual formulation used in the study (which used a 90 mg formulation only) is shown on the right.

TWi's Response To Takeda's Motion
For Summary Judgment
Case no. 5:13-cv-2420 lhk

TABLE 2

| Component of | Quantity per Capsule (mg) | | |
|---|---|---|---|
| Granules-LL | 30 mg | 60 mg | 90 mg |
| CORE GRANULES | | | |
| TAK-390 | 6.5-8.5 | 14-16 | 21.5-23.5 |
| Sugar Sphere (500 µm to 710 µm) | 12.8-14.9 | 9-11 | 14-16 |
| Stabilizer | 4.5-6.5 | 3-5 | 4-6 |
| Diluent | 5.0-30.0 | 5.0-30.0 | 5.0-30.0 |
| Distintegrant | 3.14-5.15 | 2-4 | 3.5-5.5 |
| Binder | 0.06-0.26 | 0.02-0.22 | 0.08-0.28 |
| Solvent[*3] | q.s. | q.s. | q.s. |
| PROTECTIVE LAYER | | | |
| Film Former | 1.0-5.0 | 1.0-5.0 | 1.0-5.0 |
| Anti-Adherent | 0.4-3.0 | 0.4-3.0 | 0.4-3.0 |
| Pigment | 0.5-3.5 | 0.5-3.5 | 0.5-3.5 |
| Solvent[*3] | q.s. | q.s. | q.s. |
| ENTERIC LAYER-L | | | |
| Pigment | 0.5-2.0 | 0.5-2.0 | 0.5-2.5 |
| Anti-adherent | 1.9-4.0 | 0.9-3.0 | 1.9-5.0 |
| Methacrylic Acid Copolymer Dispersion[*1] | 6.0-12.0[*2] | 6.0-12.0[*2] | 6.0-12.0[*2] |
| Plasticizer | 0.5-2.5 | 0.5-2.5 | 0.5-2.5 |
| Surfactant | 0.1-1.0 | 0.1-1.0 | 0.1-1.0 |
| Solvent[*3] | q.s. | q.s. | q.s. |
| LUBRICATION | | | |
| Antistatic agent | 0.01-0.1 | 0.01-0.1 | 0.01-0.1 |
| Glidant | 0.01-0.1 | 0.01-0.1 | 0.01-0.1 |

[*1] Lacquer suspension (amount of dry lacquer in suspension is about 30%)
[*2] Amount as dry lacquer substance
[*3] Evaporated during manufacturing

(TAK-390MR Granules-L-S)

| NAME OF INGREDIENT | FORMULA (mg/capsule) | FUNCTION |
|---|---|---|
| ACTIVE INGREDIENT | | |
| TAK-390 | 22.5 | Active substance |
| OTHER INGREDIENTS | | |
| Sugar Sphere | 15 | Diluent |
| Magnesium Carbonate | 6 | Stabilizer |
| Sucrose | 14.82 | Diluent |
| Low-Substituted Hydroxypropyl Cellulose | 4.5 | Disintegrant |
| Hydroxypropyl Cellulose | 0.18 | Binder |
| Hypromellose 2910 | 3.94 | Film former |
| Talc | 4.545 | Glidant |
| Titanium Dioxide | 3.41 | Pigment |
| Methacrylic Acid Copolymer Dispersion[*1] | 10.53[*2] | Enteric coating agent |
| Polyethylene Glycol 8000 | 1.05 | Plasticizer |
| Polysorbate 80 | 0.48 | Surfactant |
| Colloidal Silicon Dioxide | 0.045 | Antistatic agent |
| Purified Water[*3] | q.s. | Solvent |
| SUB TOTAL | 87 | |

[*1]: Lacquer suspension (Amount of dry lacquer substance is ca.30%)
[*2]: Amount as dry lacquer substance
[*3]: Evaporated during manufacturing

(*Compare* Mizerk Decl. Ex. B, '158 patent at Table 2 *with* Mizerk Decl. R at DEX136541.)  Rather than reveal the actual formulation used in the testing disclosed in the '158 patent, the inventors obfuscated the facts by providing ranges and not actually disclosing the excipients used and misleadingly insinuated that 30 and 60 mg versions of the formulation were tested.   For instance, the amount of active ingredient in the low-pH bead of the 90 mg product tested was 22.5 mg.  The '158 inventors listed it as a range of 21.5-23.5 mg.  The amount of diluent used was 44.46 mg; the '158 inventors disclosed a range of 10.0-50.0 mg.  The amount of plasticizer used was 1.05 mg; the '158 patent inventors disclosed a range of 0.5-2.5 mg.  One need only look at the tables to see that, despite arguing now that the only thing inventive was their testing, the '158 patent inventors took great pains to obfuscate their actual formulation.  And this is just the low-pH bead.  The same chicanery occurred with the high-pH bead as well:

TABLE 3

| Component-Granules-H | Quantity per capsule (mg) | | |
|---|---|---|---|
| | 30 mg | 60 mg | 90 mg |
| **CORE GRANULES** | | | |
| TAK-390 | 21.5-23.5 | 43-46 | 66.5-68.5 |
| Sugar Sphere | 14-16 | 29-31 | 44-46 |
| (500 μm to 710 μm) | | | |
| Stabilizer | 5-7 | 11-13 | 17-19 |
| Diluent | 10.0-50.0 | 10.0-50.0 | 10.0-50.0 |
| Disintegrant | 3.5-6.0 | 8-10 | 12.5-15.0 |
| Binder | 0.10-0.50 | 0.10-.75 | 0.1-1.0 |
| Solvent* | q.s. | q.s. | q.s. |
| **PROTECTIVE LAYER** | | | |
| Film Former | 2.0-15.0 | 2.0-15.0 | 2.0-15.0 |
| Anti-adherent | 1.0-6.0 | 1.0-6.0 | 1.0-6.0 |
| Pigment | 1.3-3.2 | 3.72-5.2 | 6.0-8.1 |
| Solvent* | q.s. | q.s. | q.s. |
| **ENTERIC LAYER-H** | | | |
| Anti-adherent | 9.63-12.0 | 20.26-22.3 | 30.89-33.0 |
| Methacrylic Acid | 4.0-16.0 | 8.0-33.0 | 14.0-50.0 |
| Copolymer Type B | | | |
| Methacrylic Acid | 4.0-16.0 | 8.0-33.0 | 14.0-50.0 |
| Copolymer Type A | | | |
| Plasticizer | 1.12-3.0 | 3.24-5.0 | 5.36-7.5 |
| Dehydrated Alcohol* | q.s. | q.s. | q.s. |
| Purified Water* | q.s. | q.s. | q.s. |
| **LUBRICATION** | | | |
| Glidant | 0.01-0.1 | 0.01-0.1 | 0.01-0.1 |
| Antistatic agent | 0.01-0.1 | 0.01-0.1 | 0.01-0.1 |

*Evaporated during manufacturing

| (TAK-390MR Granules-H) | | |
|---|---|---|
| NAME OF INGREDIENT | FORMULA (mg/capsule) | FUNCTION |
| **ACTIVE INGREDIENT** | | |
| TAK-390 | 67.5 | Active substance |
| **OTHER INGREDIENTS** | | |
| Sugar Sphere | 45 | Diluent |
| Magnesium Carbonate | 18 | Stabilizer |
| Sucrose | 44.46 | Diluent |
| Low-Substituted | 13.5 | Disintegrant |
| Hydroxypropyl Cellulose | | |
| Hydroxypropyl Cellulose | 0.54 | Binder |
| Hypromellose 2910 | 11.82 | Film former |
| Talc | 36.78 | Glidant |
| Titanium Dioxide | 7.08 | Pigment |
| Methacrylic Acid | 47.85 | Enteric coating |
| Copolymer Type B | | agent |
| Methacrylic Acid | 15.96 | Enteric coating |
| Copolymer Type A | | agent |
| Triethyl Citrate | 6.36 | Plasticizer |
| Colloidal Silicon Dioxide | 0.15 | Antistatic agent |
| Dehydrated Alcohol* | q.s. | Solvent |
| Purified Water* | q.s. | Solvent |
| **SUB TOTAL** | 315 | |

*: Evaporated during manufacturing

(*Compare* Mizerk Decl. Ex. B, '158 patent at Table 2 *with* Mizerk Decl. R at DEX136542.)  This is not an instance where multiple formulations were tested and known to work, therefore claiming a range would make sense.  No 30 mg product or 60 mg product was subjected to any testing disclosed in the patent.  No other 90 mg product was tested.  Here, the '158 patent inventors and Ms. Mueller knew the actual formulation tested and took the extra step of obfuscating it.

Not only did the '158 inventors and their patent attorney hide the formulation used, they also argued to the PTO that the formulation was a novel aspect of the invention.  Patent attorney Mueller worked as the '158 patent inventors' attorney and representative before the PTO and in that role she continued to argue that the formulation, which she knew had already been claimed in Akiyama, was novel.  (Mizerk Decl. Ex. S, Power of Attorney.)  As part of her work on the '158 patent application she submitted an amendment and preliminary remarks to the PTO that argued "[s]ignificantly, the pharmaceutical composition described in Examples 1 and 2 and in claim 31 produces a dual peaked pharmacokinetic profile."  (Mizerk Decl. Ex. T at TAKEDA006943-44.)  She further explained to the PTO that the formulation had a first peak that occurred within 1-2 hours and a second peak at 4-5 hours

TWi's Response To Takeda's Motion
For Summary Judgment
Case no. 5:13-cv-2420 lhk

after dosing.  (*Id.* at TAKEDA006944.)  Ms. Mueller did not tell the PTO that the pharmaceutical composition described could be found in the Akiyama patent, or that none of the '158 patent inventors had actually made the formulation she was describing.  After Ms. Mueller made her arguments regarding the formulation the examiner allowed the claims, noting that "[**t]he prior art does not teach or suggest the claimed invention as pharmaceutical compositions** comprising dexlansoprazole with the claimed amount that provide effective treatments of acid reflux . . . ."  (Mizerk Decl. Ex. U at TAKEDA006876 (emphasis added).)

Ms. Mueller never attempted to disabuse the examiner of her incorrect impression, despite acknowledging that (a) Ms. Mueller knew the formulation had already been disclosed in Akiyama and (b) there was no way for examiner to know the formulation had already been disclosed in Akiyama:

> Q. Did anybody -- were you aware that the formulation used in the studies included in the '158 patent was the same formulation that is set forth in the '755 patent?
>
> A. Yes.
>
> Q. Did you at any time tell, advise the patent office that the formulation that from which the data was derived that's included in the '158 patent was from a previously filed and issued patent, was from a formulation set forth and described in a previously issued patent, the '755 patent?
>
> A. **I never told the patent office that the TAK-390MR was this -- was the subject of another patent application, although that patent application describing TAK-390 was submitted to the patent office**.
>
> Q. But the '158 patent does not tell anybody that the data is derived from testing of a formulation described in the '755 patent, correct?
>
> A. Correct, because we viewed this as a new method of treating using a known formulation.
>
> Q. But the patent office would have no way of knowing that the formulation described in the '158 patent and used in the testing was the formulation disclosed in the '755 patent, correct?
>
> A. No, **the only thing the application says in the background section is it makes reference to the PCT publication of the '755**, which ultimately became the '755 patent that mentions dexlansoprazole as being disclosed in that published PCT application.
>
> A. I'm sorry, I think you tried to answer my question, but I don't think it came out very clear. **Is it correct that the patent office would have no way of knowing from what information you provided them that the formulation whose test results are provided in the '158 patent was a formulation disclosed, was the same formulation disclosed in the '755 patent?**
>
> A. **Yes.**

1    (Mizerk Decl. Ex. E, Mueller Dep. at 79:18-82:5 (emphasis added) (objections and re-reading of

2    questions omitted).)  Simply put, the inventors and Ms. Mueller intentionally hid the ball.  That ball was

3    material to patentability, and there can be no question that the only reasonable inference from hiding the

4    ball was to deceive the PTO.

5    **B.    The Failure To Disclose That The Formulation Tested Was Already Patented Was**
        **Material To Patentability.**

6

7    Takeda argues that, because they disclosed Akiyama as prior art generally, there was no need to

8    explain to the examiner that Akiyama disclosed the specific formulation tested, because the inventive

9    portion of the patent was the "without regard to meals" limitation.  (Pls. Br. at 16-17.)  Takeda's

10   argument turns the prosecution process on its head, especially when coupled with its admission that the

11   examiner had no way of knowing the Akiyama formulation was the one used by the '158 patent

12   inventors.  The Federal Circuit in *Therasense* stated that in such instances, disclosure is required:

13   "Moreover, if this could be regarded as a close case, which it is not, we have repeatedly emphasized that

14   the duty of disclosure requires that the material in question be submitted to the examiner rather than

15   withheld by the applicant."  593 F.3d at 1305 (citing *LNP Eng'g Plastics, Inc. v. Miller Waste Mills,*

16   *Inc.*, 275 F.3d 1347, 1361 (Fed. Cir. 2001) ("[W]hen a question of materiality is close, a patent applicant

17   should err on the side of disclosure."); *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066,

18   1076 (Fed. Cir. 1992) ("[A close case] makes it all the more necessary that the [reference] should [be]

19   disclosed to the examiner. Close cases should be resolved by disclosure, not unilaterally by the

20   applicant.")).

21   "Patent prosecution is an ex parte process and, consequently, '[p]ublic interest demands that all

22   facts relevant to such matters be submitted formally or informally to the Patent Office, which can then

23   pass upon the sufficiency of the evidence. Only in this way can that agency act to safeguard the public in

24   the first instance against fraudulent patent monopolies.'"  *Gen. Elec. Co. v. Mitsubishi Heavy Indus.*

25   *Ltd.*, 946 F.Supp. 2d 582, 588 (N.D. Tex. 2013) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint.*

26   *Mach. Co.,* 324 U.S. 806, 816 (1945)). "[T]he nature of an application for patent, [and] the relationship

27   of attorneys to the Patent Office requires the highest degree of candor and good faith. In its relation to

28   applicants, the [PTO examiner] must rely upon their integrity and deal with them in a spirit of trust and

TWI'S RESPONSE TO TAKEDA'S MOTION
                                                FOR SUMMARY JUDGMENT
                                                CASE NO. 5:13-CV-2420 LHK

confidence." *Kingsland v. Dorsey*, 338 U.S. 318, 319 (1949) (quoting statement made by the Patent Office Committee on Enrollment and Disbarment) (ellipses and internal quotation marks omitted). "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO examiner], which includes a duty to disclose to the [PTO examiner] all information known to that individual to be material to patentability ...." 37 C.F.R. § 1.56(a).  A "[v]iolation of the duty of candor constitutes inequitable conduct." *Avocent Redmond Corp. v. Raritan Ams., Inc.*, 921 F.Supp. 2d 229, 242 (S.D.N.Y. 2013).

Importantly, TWi need only show that the PTO "preponderance of the evidence" standard is met for the sake of materiality, and the omission of the fact that the formulation had already been claimed in the prior art clearly meets that standard.  The MPEP devotes a section to cases, such as this one, where an applicant seeks a patent based on measuring a previously unknown property of a known formulation. MPEP § 2112.  Heading three of the section reads "A REJECTION UNDER 35 U.S.C. 102/103 CAN BE MADE WHEN THE PRIOR ART PRODUCT SEEMS TO BE IDENTICAL EXCEPT THAT THE PRIOR ART IS SILENT AS TO AN INHERENT CHARACTERISTIC." *Id.* (capitalization in original).  The examiner never made a determination regarding the inherent characteristic of TAK-390MR, because no one told her TAK-390MR was already claimed in Akiyama—despite discussing the reference at an in-person interview.  (Mizerk Decl. Ex. T at TAKEDA006944.)

Ms. Mueller and the '158 patent inventors took the question of inherency vis-à-vis Akiyama's disclosure of the tested formulation out of the hands of the examiner.  This is exactly the opposite of what was supposed to happen.  They deprived the examiner of the ability to engage the question whether the "without regard to meals" aspect of the claimed invention was actually novel, and that should have been the sole material question regarding the patentability of the claimed invention. Instead, the examiner was led to believe the opposite—that the tested formulation was actually new.  This was a fraud upon the PTO and cannot be countenanced.

### C.    The Partial Disclosure Of Akiyama Demonstrates Intent To Deceive.

Takeda admits that there was no possible way for the examiner to know that the tested formulation was the formulation disclosed in Akiyama, yet Takeda argues that the disclosure of Akiyama somehow absolves all of their sins.  This theory is incorrect as a matter of law.  "Partial

disclosure of material information about the prior art to the PTO cannot absolve a patentee of intent if the disclosure is intentionally selective." *Am. Calcar*, 768 F.3d at 1190; *Aventis Pharma*, 675 F.3d at 1335-36; *see also Semiconductor Energy Lab.*, 204 F.3d at 1376 (finding intent where the patentee disclosed a complete reference in Japanese but did not provide translations of that part which was material to patentability); *Apotex*, 763 F.3d at 1362 (finding intent on the basis of an inventor misrepresenting material information about disclosed prior art). By disclosing Akiyama but not explaining that it was the tested formulation, Takeda actually hid the formulation in plain sight, further demonstrating their intent to deceive the PTO.

A recent case in the Southern District of New York addressed precisely this sort of partial disclosure and found that the only reason for such a disclosure would be to deceive the PTO. In *Worldwide Home Prods., Inc. v. Bed, Bath and Beyond, Inc.*, the court found that, where an attorney provided incomplete information on behalf of the inventors, "the only reasonable inference to be drawn from the undisputed facts is that [the attorney] intended to deceive the PTO examiner about a reference he knew was material and that he in fact did so." ___ F.Supp.3d ___, 2015 WL 568710, at *10 (S.D.N.Y. Feb. 11, 2015). In that case the attorney filed an amended application distinguishing the prior art, when in fact he knew that the prior art contained the same attributes as the claimed invention. *Id.* The court held that "[l]ogic dictates the conclusion that [the attorney] misrepresented the cascade hook feature of the Merrick hangers to the PTO examiner in the telephone conversation, rendering the examiner receptive to the Amended Application, which draws a false distinction between Plaintiff's hangers and the Merrick Reference." *Id.* Finally, the court concluded that the attorney "selectively withheld from the PTO examiner the most relevant information concerning the physical attributes of the hanger product depicted in the reference that [the attorney] provided to the PTO examiner, which is indicative of a clear intent to deceive." *Id.* at *11. So too here. By arguing for the novelty of a formulation that she knew to be disclosed in Akiyama, Ms. Mueller demonstrated a clear intent to deceive the PTO.

The inventors and Ms. Mueller provided the PTO with incomplete information regarding the formulation tested, and did not tell PTO that the formulation had already been claimed elsewhere. Because that information would have been material to the PTO's analysis, and because there is no other

reasonable conclusion other than Ms. Mueller and the '158 inventors intended to deceive the PTO, Takeda's motion for summary judgment of no inequitable conduct regarding the '158 patent should be denied.

**V.    CONCLUSION**

    For the reasons stated above, TWi respectfully requests that Takeda's motion for summary judgment of no inequitable conduct be denied.

DATED: March 5, 2015                    **HUSCH BLACKWELL LLP**.

    By:    */s/ Don J. Mizerk*
    Don J. Mizerk (SBN 208477)
    *don.mizerk@huschblackwell.com*
    HUSCH BLACKWELL LLP
    120 S. Riverside Plaza, Suite 2200
    Chicago, IL 60606
    Telephone: (312) 655-1500
    Facsimile: (312) 655-1501

    Attorney for Defendant
    TWi Pharmaceuticals, Inc.

TWi's Response To Takeda's Motion
For Summary Judgment
Case no. 5:13-cv-2420 lhk